UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA RHOADS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:04CV997 SNL |
| | ) | (TIA) |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security

Administration.  All pretrial matters were referred to the undersigned United States Magistrate

Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.      Procedural History**

On November 12, 2002, claimant Paula Rhoads filed an application for

Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42

U.S.C. §§ 1381, et seq. (Tr. 54-57).[1]  Claimant stated that her disability began on October 8,

2002, due to disc herniation/bulge, deteriorated discs, a damaged sacroiliac nerve, and bilateral

carpal tunnel syndrome.  (Tr. 46-47, 124).  On initial consideration, the Social Security

Administration denied claimant's claims for benefits.  (Tr.47-51).  Claimant requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. 41-45).  On February 27, 2004, a hearing was

held before an ALJ.  (Tr. 204-30).  Claimant testified and was represented by counsel.  (Id.).  A

---

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 12/filed November 1, 2004).

vocational expert also testified at the hearing.  (Tr. 225-29).  Thereafter, on March 23, 2004, the

ALJ issued a decision denying claimant's claims for benefits.  (Tr. 7-17).  On June 24, 2004, the

Appeals Council found no basis for changing the ALJ's decision and denied claimant's request for

review of the ALJ's decision.  (Tr. 4-6).  The ALJ's determination thus stands as the final decision

of the Commissioner.  42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on February 27, 2004

#### 1.  Claimant's Testimony

At the hearing on February 27, 2004, claimant testified in response to questions

posed by the ALJ, counsel, and the vocational expert.  (Tr. 204-30).   At the outset, the ALJ

noted that claimant appeared to be in pain and offered claimant the option of standing.  (Tr. 207).

Claimant requested to stand after the long drive to the hearing, and the ALJ deferred to claimant

to determine how she would feel most comfortable. (Tr. 207).  After starting the hearing, claimant

requested to be seated, and the ALJ instructed claimant to do what would make her feel most

comfortable.  (Tr. 211).  At the time of the hearing, claimant was forty years of age, and her date

of birth is January 27, 1964. (Tr. 208).  Claimant testified that she completed fourteen years of

school.  Claimant is right-handed and five feet seven inches tall and weighs 189 pounds.  (Tr.

208).  Claimant testified that she is divorced and lives with her two sons, ages sixteen and

eighteen.  (Tr. 217).  Claimant testified that she receives ADC and Medicaid but no child support

from the boys' father.  (Tr. 222).

Claimant testified that she has not worked since leaving her last job in September,

2002, over two years earlier.  (Tr. 208).  Claimant explained she worked for herself as a painter

and wallpaper hanger for approximately a year, but she could not physically do the job. (Tr. 208, 212). For two years, claimant worked part time as a sales representative for a flooring/wallpaper store, but she was laid off because of her back. (Tr. 209). Claimant testified that she has worked jobs as a cashier clerk at a department store and a winery. As a remittance processor for a bank, claimant sat and worked at a mail-opening machine opening mail and filing checks and stubs. (Tr. 209). Claimant explained how she hurt her back five years earlier while working at a bindery company lifting heavy books. (Tr. 209-10). Claimant testified that she had been hired to sketch artwork but in reality she was lifting books off a conveyor belt. Claimant testified that she fractured her back from lifting too many heavy books at such a fast pace. (Tr. 210). Although she requested to be relieved of the position, her request was denied. (Tr. 210-11).

After the injury at work, claimant started receiving medical treatment from Dr. Tate at Park West Surgical. (Tr. 211). Dr. Tate, the company doctor, ordered a MRI and physical therapy for six months and prescribed medications as treatment. (Tr. 211). Dr. Tate noted that the MRI revealed a sprained back, torn ligaments, and either a bulging disc or a herniated disc. (Tr. 212). Claimant testified that Dr. Tate treated her for only a year, because the company would not authorize any more treatment. Thereafter, claimant sought treatment by Dr. Agasino. (Tr. 212). Dr. Agasino performed a MRI of her upper and lower back in November, 2003. (Tr. 213). Dr. Agasino reported that the MRI revealed either a bulging or herniated disc, eleven deteriorated discs, and a fractured upper back. Claimant testified that most of her pain is in the lower back and left leg. (Tr. 213). Dr. Agasino, claimant's treating physician for three years, indicated that surgery is not an option. (Tr. 214). Claimant testified that Dr. Agasino is confident in her medical treatment of prescribing medications and physical therapy. Claimant

testified that she takes a pain reliever, Fixoden, and a muscle relaxer, Soma, as well as over-the-counter Tylenol. Claimant explained that Dr. Agasino switches her medication regimen every three months because of her upset stomach problems. (Tr. 214). Claimant testified that the physical therapist treats her with different exercises and movements to enable her to have more body movement but the treatment has irritated her more than helped. Claimant testified that taking hot baths and reclining helps most and medication only provides relief for twenty minutes. (Tr. 215). Claimant received an injection in her back at the Western University Pain Management Center in September, 2000. (Tr. 223). On referral by Dr. Agasino, Dr. Wetherington, a back specialist surgeon, ordered a lumbar injection, but the records indicate that claimant received the injection at L5, S1 and caused damage to her nerve. After the injection, claimant received medical care in the emergency room. (Tr. 223). Claimant testified that the shot made things worse on an ongoing basis. (Tr. 224).

Claimant testified that she developed carpal tunnel syndrome in her hands at approximately the same time she started having problems with her back. (Tr. 215). Electrolysis revealed the carpal tunnel and Dr. Agasino provided gloves for claimant to wear. (Tr. 216). Claimant indicated that the doctor is not yet considering surgery, but she had surgery on her right wrist after slicing a tendon in an accident. Claimant testified that both of her hands bother her. (Tr. 216). Claimant testified that she had an earlier surgery on her right hand before she developed the carpal tunnel. (Tr. 217). In November 2002, claimant had x-rays taken of her right shoulder because of pain and clicking with movement. (Tr. 224).

As to her daily activities, claimant testified that she cooks breakfast, does the laundry, and dusts the furniture. (Tr. 217). Claimant requested to stand and the ALJ reminded her

that she did not have to ask, but that she could do whatever makes her most comfortable. Claimant explained that her sons vacuum and sweep and sometimes cook if she does not feel like cooking. Claimant explained that standing causes left leg pain. After ten minutes of standing or sitting, claimant becomes dizzy. (Tr. 217). Claimant testified that ten to fifteen minutes is the amount of time she can stand on her feet. (Tr. 218). Claimant testified that she lies down several times during the day, twice an hour. (Tr. 224). Claimant takes her sons grocery shopping so that they can place the items in the cart and push the cart, but she has to rest every aisle and a half. (Tr. 218). Claimant testified that either she or her oldest son drives to the grocery store. (Tr. 219). Claimant's oldest son drove her to the hearing, but they had to stop two times. (Tr. 219). Claimant testified that she attends Bible study at an older woman's house and attends church but has problems sitting through the service. (Tr. 222). Claimant explained that she cannot attend her sons' teacher conferences or activities. (Tr. 222). Claimant testified that she has problems sleeping at night due to pain and that she can sleep for a three-hour stretch of time. (Tr. 221). When she cannot sleep, claimant takes a hot bath to alleviate the pain. Claimant testified that the pain started in 1999 and is increasing in severity. (Tr. 221).

Claimant explained that she cannot sit longer than five to seven minutes without having to move around and no longer than ten to fifteen minutes without having to get up. (Tr. 219). If she cannot get up, claimant lies down to stop the pain. If the pain continues, claimant becomes dizzy, and she passes out. Claimant testified that she follows the same pattern at home with squirming after ten minutes of sitting and changing positions after fifteen minutes. (Tr. 219). Claimant testified that the most comfortable position is when she lies down on her side in the bathtub filled with hot water. (Tr. 220). Claimant explained that if she lies down on a couch or a

bed for too long, she experiences pain and has to turn over. Claimant started to walk around the hearing room and explained how walking helps the pain. Claimant testified that the heaviest item she can lift is a not quite full two-liter bottle of soda, but that she could not carry a gallon of milk. (Tr. 220). Claimant explained that if she carried a gallon of milk, she would experience a bad strain in her lower left back and left leg. (Tr. 221). Claimant testified that her left leg bothers her the most, and the leg has given out on her within the last week or two. (Tr. 221).

## 2. Testimony of Vocational Expert

Vocational Expert Dr. John McGowan listened to the testimony during the hearing and reviewed the exhibits admitted into evidence. (Tr. 225). Dr. McGowan stated that he has worked in the counseling center at the university, specializing in rehabilitation work and that he has served as vocational expert for the Social Security Administration for twenty-five years. The ALJ asked Dr. McGowan to assume the following:

> If I were to find that because of her back condition that she was restricted to lifting ten pounds frequently, probably no more than that because I don't want to get into the other problems she's got, but could lift ten pounds frequently, had some problem remaining in a sat position for a long period of time. She can be on her feet for maybe up to a half-hour. She can sit for a half-hour. But if she were able to alternate positions between sitting and standing during those general time frames – would be able to remain at a workstation with proper attention and concentration, are there jobs that could be done if those are the only limitations that she had?

(Tr. 225). Dr. McGowan opined that claimant could return to some of her previous positions including the position of cashier clerk, interior decorator, and remittance processor. (Tr. 226). Dr. McGowan explained that those type of jobs would be limited in number inasmuch as such jobs would not include a full range of cashiering jobs and a limited number of reception information clerks. In reference to cashiering jobs, Dr. McGowan opined that there would be 15,000 such

jobs in the State of Missouri, and 1,407 such jobs within the region, the nineteen counties surrounding Jefferson City. With respect to the position of a reception information clerk, Dr. McGowan opined that there would be 6,000 such jobs within the state and 1,219 such jobs within the region. (Tr. 226). Dr. McGowan agreed that both the reception information clerk and cashier jobs would require use of hands continually but noted neither job required a repetitive assembly type use of the hands. (Tr. 227).

The ALJ then asked Dr. McGowan to assume that claimant was more limited than previously indicated and had to alternate between positions of sitting, standing, and laying down. (Tr. 227). Dr. McGowan opined that as soon as the ALJ interjected the laying down requirement to the hypothetical, claimant would not be able to perform the jobs he previously mentioned. The ALJ noted that such jobs would require continuous but not repetitive use of the hands. (Tr. 227).

In response to counsel's question regarding grocery store clerks being more susceptible to carpal tunnel syndrome than convenience store clerks because the grocery store clerk's job entails more repetition, Dr. McGowan agreed and explained that repetition was what he was referencing with respect to an assembly line job. (Tr. 228). Dr. McGowan further clarified in response to the ALJ's question regarding the other cashiering jobs being outside the grocery store cashiering by explaining that a grocery store cashiering job falls into the light, not sedentary, classification. (Tr. 229). Dr. McGowan opined that claimant could not work such jobs. (Tr. 229).

### 3. Forms Completed by Claimant

In the Pain and the Claimant Questionnaires completed by claimant on November

26, 2002, claimant described her pain as stabbing and sharp pulling in her lower back. (Tr. 99, 100). Claimant also reported constant pain in both hands and left buttocks down to her left knee triggered by sitting, standing, or walking. Claimant reported taking prescription medications and hot baths to relieve the pain, but the relief lasting fifteen to thirty minutes. Claimant listed Vicodin and Larisoprodol as medications prescribed by Dr. Agasino. Claimant reported dizziness, sleepiness, and slurred speech as side effects from her medications. Claimant noted that she cannot remain in one position for a long time without experiencing pain. (Tr. 99, 100).

In the Work History Report completed by claimant on November 24, 2002, claimant reported being unable to remain in one position for more than fifteen to twenty minutes without moving due to severe pain in her back and left leg. (Tr. 115-22).

## III. Medical Records

At the outset, the undersigned notes that Dr. Armela Agasino's clinic treatment notes are mostly illegible. On June 14, 1996, Dr. Agasino first treated claimant for a side pain and diagnosed claimant with gastritis. (Tr. 181-82). The Upper GI Series performed on June 18, 1996, revealed spasm pylorus and deformed duodenal bulb from scar from previous peptic disease. (Tr. 184). On July 2, 1996, claimant complained of gastritis but feeling better after the earlier treatment. (Tr. 180). Dr. Agasino ordered claimant to finish the Prilosec medication and to continue the Zantac medication. (Tr. 180). In an office visit on March 16, 1998, claimant reported to Dr. Agasino pain in her right wrist. (Tr. 179). After examination, Dr. Agasino found claimant to have carpal tunnel syndrome. (Tr. 179). On September 9, 1998, claimant reported reoccurring stomach problems for over two months. (Tr. 178). Dr. Agasino diagnosed claimant with a peptic ulcer and prescribed medication as treatment. (Tr. 178). The Radiology

Consultation Report dated November 23, 1998, revealed no fracture, dislocation, bone destruction, or opaque foreign body in claimant's right foot. (Tr. 183). On December 7, 1998, Dr. Agasino treated claimant for a sprained ankle and a dog bite. (Tr. 177).

In the ProRehab progress note dated February 8, 2000, Sharon Titter, a physical therapist, noted how claimant ambulates into the clinic with equal weight bearing bilaterally. (Tr. 136). Examination revealed moderate tenderness throughout the left lumbosacral paraspinals and left SI region. Claimant reported severe pain with gentle compression of the sacrum and palpation to central lumbar spine. Ms. Titter opined that claimant's symptoms are consistent with a lumbar strain. Ms. Titter noted that claimant's score of 73% on the Oswestry Pain Questionnaire, a score interpreted as crippling perceived disability, is inconsistent with claimant's available mobility and objective findings in clinic. Ms. Titter recommended that claimant continue therapy three times a week for the next two weeks and noted that rehab potential is guarded at that time. (Tr. 136). In a follow-up visit on February 16, 2000, claimant reported a 50% improvement since starting therapy with a pain rating a 4/10 at best and 8/10 at worst as compared to a 8/10 at best and a 10/10 at worst at the time of initial evaluation. (Tr. 135). Claimant reported continued sharp, burning pain across the entire lower back and an intermittent sensation behind both knees. Claimant reported how taking a hot bath decreases the pain for a few hours. Ms. Titter noted that claimant with an increased cadence and decreased guarding as compared to the initial evaluation. Ms. Titter noted that palpation continued to produce moderate tenderness throughout the left lumbosacral paraspinals with severe complaints of pain with superficial palpation to the central lumbar spine. Ms. Titter treated claimant with moist heat to the lower back with continuous ultrasound to the left lumbar spine and soft tissue mobilization. Ms. Titter noted that claimant has

made progress over the first four visits despite claimant's score on the Oswestry Pain Questionnaire still being inconsistent with her available mobility. (Tr. 135). On February 29, 2000, claimant returned for physical therapy treatment and reported her back feeling a lot better with an 80% improvement in symptoms since starting therapy and a pain rating of 2/10. (Tr. 134). Ms. Titter noted that claimant ambulated into the clinic with a fluid gait pattern and the Waddell's testing producing negative results as compared to the earlier positive results. Ms. Titter noted that claimant has made good progress over the last three visits with a significant decrease in symptoms and an increase in mobility. Ms. Titter found claimant to be independent with a HEP to continue progressing at home and instructed claimant to continue strengthening and using proper body mechanics and good positioning. (Tr. 134). On March 8, 2000, claimant returned and reported 70% improvement in symptoms but on that day experiencing an increase in the central low back pain caused by sitting, driving, or standing for any extended amount of time. (Tr. 133). Ms. Titter observed that claimant's pain is localized in the central lumbar spine. (Tr. 133).

On May 15, 2000, claimant reported low back pain lasting for the last five months. (Tr. 175). Claimant described the pain as sharp and stabbing in her lower back. Dr. Agasino referred claimant to Dr. Wetherington for treatment. (Tr. 175).

On May 30, 2000, Dr. Charles Wetherington, a neurosurgeon, treated claimant for low back pain and recommended claimant undergo a left sacroiliac joint injection under fluoroscopy, an EMG, and a nerve conduction studies of her upper extremities. (Tr. 161). Physical examination of claimant revealed very mild tenderness over claimant's right sacroiliac joint. After reviewing claimant's MRI, Dr. Wetherington noted that claimant has degenerative

disc disease at L5-S1 and no evidence of any herniation or nerve root compression. (Tr. 161).

On September 14, 2000, Dr. R.C. Ravikumar, a fellow with the Washington University Pain Management Center, evaluated claimant for lower back pain and pain in left buttocks and both legs. (Tr. 138-41). Claimant reported breaking her back while lifting books at work on December 27, 1999, and experiencing constant pain in the lower back in the 7/10 range since the injury.[2] (Tr. 138). Claimant tried several treatments for the low back pain, including physical therapy for two months, but reported the treatments not helping much. Claimant recently stopped smoking after smoking for seven years. A MRI of the lumbosacral spine revealed left paracentral disc bulge without herniation below the level of the exiting nerve root at L5-S1. (Tr. 138). Dr. Ravikumar noted in the impression section that claimant has chronic low back pain and left lumbago, degenerative disc disease, and left paracentral disc bulge at L5-S1. (Tr. 139). As the treatment plan, Dr. Ravikumar ordered a lumbar epidural steroid injection at L5-S1, physical therapy, and continued the Ultram prescription. (Tr. 139). Dr. Robert Swarm, a surgeon, performed a lumbar epidural steroid injection at L5-S1 under fluoroscopy on claimant. (Tr. 143-44). Dr. Swarm noted that claimant tolerated the procedure well and experienced no apparent complications and decrease in pain from the injected local anesthetic. (Tr. 143). Dr. Swarm recommended claimant to return in three to four weeks for a possible second lumbar epidural steroid injection. (Tr. 144). In a follow-up call after the procedure on September 15, 2000, claimant reported having a frontal headache immediately after the procedure. (Tr. 146). Dr. Ravikumar called claimant back at work and instructed her to increase her fluid intake, especially caffeinated beverages, and to not push, pull, bend, or lift and rest as much as possible. In the

---

[2]The undersigned notes that the medical record is devoid of any evidence substantiating claimant's allegation of breaking her back in December, 1999.

check-up call regarding her condition, claimant reported feeling better with the headache decreased and admitted not having filled the Ultram prescription. (Tr. 146).

On September 18, 2000, claimant received emergency room treatment at Missouri Baptist Hospital in Sullivan, Missouri, for a possible allergic reaction. (Tr. 152). Claimant reported having a severe headache, head and neck pain. (Tr. 153, 156). Claimant received Percocet as treatment and ordered to seek follow-up treatment with Dr. Swarm. (Tr. 154-55).

Claimant canceled the EBP appointment scheduled for September 19, 2000, stating the headache is less severe and reporting she is functioning much better at work. (Tr. 145). Claimant was instructed to call back Dr. Swarm's office if her headache intensified. (Tr. 145).

In a follow-visit on November 16, 2000, claimant returned to Dr. Wetherington after completion of her EMG and nerve conduction velocities as well as injections. (Tr. 160). Claimant reported experiencing a spinal headache after the injection. Dr. Wetherington questioned whether claimant underwent a lumbar epidural steroid injection rather than the sacroiliac joint injection. Dr. Wetherington opined that claimant did not need a lumbar epidural steroid injection and recommended that claimant receive a sacroiliac joint injection on the left under fluoroscopy but performed by a different provider. The EMG and nerve conduction velocities revealed bilateral carpal tunnel syndrome. Claimant reported not having significant problems with her hands at that time and only when she is active and doing repetitive motions. Dr. Wetherington recommended claimant obtain hyperextension wrist braces to be worn whenever doing repetitive motions. (Tr. 160).

On December 11, 2000, claimant called Dr. Swarm's office and reported having

dizzy spells and headaches. Claimant was instructed to schedule an appointment with one of the doctors in the office so that a course of treatment could be determined but claimant refused to schedule an appointment. (Tr. 145).

On December 18, 2000, in an office visit with Dr. Agasino, claimant reported experiencing dizzy spells. (Tr. 172). On August 1, 2001, claimant reported recurrent back pain for almost two weeks and Dr. Agasino prescribed medications. (Tr. 171).

In a follow-up visit on January 16, 2002, Dr. Agasino treated claimant for a sore throat. (Tr. 170). On February 8, 2002, Dr. Agasino treated claimant for general sick treatment. (Tr. 169). Claimant returned on May 21, 2002, for treatment of cracking/burning lips. (Tr. 168). Claimant reported having used a topical medication and changing adhesive for dentures. Dr. Agasino gave claimant a Sarafem starter pack and ordered her to consume more fluids. (Tr. 168). On October 22, 2002, claimant reported persistent back pain down to her buttocks and left leg. (Tr. 167). Claimant returned to Dr. Agasino on October 29, 2002, and reported continued back pain. (Tr. 166). Dr. Agasino prescribed Vicodin and another medication for the first time as treatment for claimant's low back pain. (Tr. 166).

On November 2, 2002, Dr. Agasino ordered a MRI of claimant's lower spine, hips, and right shoulder. (Tr. 148). Dr. Amy Mosher performed the MRI and found degenerative disc disease predominates at L5-S1. (Tr. 149, 199). Dr. Mosher further opined that the MRI revealed some disc bulge or protrusion into the superior foramen proximally on the left side at L4-5, but no other focal abnormalities or no lumbar compression fracture deformities observed. (Tr. 149, 199). Dr. Mosher also performed a MRI of claimant's thoracic spine and found very mild anterior wedging of T11 without a marrow pattern suggesting a recent compression fracture. (Tr. 150,

200).  Dr. Mosher further noted that the MRI revealed multilevel degenerative disc disease and a dominant protrusion or definite neural element encroachment not observed.  (Tr. 150, 200).  Dr. Mosher performed a MRI of claimant's right shoulder and both hips and found no evidence of focal bone abnormality in either hip and acromioclavicular joint osteoarthritis of the right shoulder.  (Tr. 151).

On November 19, 2002, Dr. Wetherington recommend that claimant undergo a left sacroiliac joint injection as treatment for her continued pain.  (Tr. 159).  Dr. Wetherington noted that claimant sought follow-up treatment "after quite a long absence since her last visit on 11/16/2000."  (Tr. 159).  Dr. Wetherington reviewed the MRI of claimant's thoracic and lumbar spine and noted that the MRI revealed small degenerative changes at T12-L1 as well as left disc protrusion at L5-S1.  Although Dr. Wetherington recommended a sacroiliac joint injection as treatment, claimant admitted never having the procedure done.  Dr. Wetherington noted that claimant's physical examination remained unchanged with significant tenderness with palpation of the left sacroiliac joint, and he once again recommended that claimant undergo a left sacroiliac joint injection.  (Tr. 159).

On December 6, 2002, Dr. Agasino opined the following on a prescription pad: "this is to certify that this patient is unable to work because of her back."  (Tr. 165).

In the Medical Source Statement (Physical) completed on December 27, 2002, Dr. Agasino opined that claimant can frequently lift and/or carry less than ten pounds, stand or walk with usual breaks for two hours in an eight-hour workday, sit with usual breaks for less than one hour in an eight-hour workday, and limited in pushing and pulling.  (Tr. 163).  With respect to other physical factors, Dr. Agasino determined claimant can never climb, stoop, kneel, crouch, or

crawl, and occasionally balance and is limited in reaching, handling, fingering, feeling, seeing, and hearing. (Tr. 164). Dr. Agasino noted that "[t]his statement is for the period from Oct. 8/02 to March 8/02." (Tr. 164).

On February 11, 2003, on referral by the Disability Determinations, Dr. Susy Alias of Metro Rehab Physicians, evaluated claimant and completed a Range of Motion Values on behalf of claimant. (Tr. 191-95). Claimant reported chronic low back pain, pain in both hands, and pain radiating to her left leg for the last two years but could not identify a specific incident causing the source of the pain. (Tr. 191). Claimant last worked as a painter in October, 2002. Claimant's back pain interferes with her walking and driving. Although steroid injections have been suggested as a course of treatment, claimant reported refusing such treatment at the time of the evaluation. In the last office visit on November 19, 2002, claimant refused to have a sacroilicac injection as recommended by Dr. Wetherington. Claimant reported her back pain started in 1999, and the pain is mostly in the middle of her back radiating down to her posterior thigh and left leg. Claimant explained that the pain increases if she sits for long periods of time. (Tr. 191). Claimant reported difficulty walking for long periods of time. (Tr. 192). Claimant listed Vicodin, Soma, and Risperda,l as her current medications. Dr. Alias noted that the MRI of claimant's lumbar spine revealed degenerative disc disease at L5-S1 and bulge or mild protrusion at origin of L4 and facet osteoarthritis at L4-5 and L5-S1. In the physical examination of claimant, Dr. Alias noted that claimant was unable to stand on her toes or heels and claimant's range of motion of neck and back was remarkably impaired. (Tr. 192). With respect to claimant's lumbar spine, Dr. Alias rated her flexion-extension at 35 degrees on a scale of 0 to 90 degrees and lateral flexion right and left at 5 degrees on a scale of 0 to 25 degrees. (Tr. 195). Dr.

Alias' diagnosis included a history of chronic low back pain and obesity. (Tr. 193). In summary, Dr. Alias opined that claimant "will be able to perform work-related functions such as standing, sitting, and walking." (Tr. 193). Dr. Alias further opined that claimant's lifting, carrying, and handling of objects should be limited to thirty pounds each time. Dr. Alias noted that claimant could benefit from weight reduction and continued physical therapy with different modalities. (Tr. 193).

In the Physical Residual Functional Capacity Assessment completed on March 14, 2003, Dr. Janie Vale listed chronic lower back pain as claimant's primary diagnosis and hand pain as claimant's secondary diagnosis. (Tr. 84-91). Dr. Vale indicated that claimant's exertional limitations included that claimant could occasionally lift ten pounds; could frequently lift ten pounds; could stand or walk a total of at least two hours in an eight-hour work day; could sit about six hours in an eight-hour work day; and was unlimited in pushing and pulling and lifting and/or carrying. (Tr. 85). Dr. Vale based her conclusions on the medical evidence including a MRI scan revealing DDD L4-5 and L5-S1 with facet OA at L4-5 and L5-S1 and the examination performed by Dr. Susy Alias where claimant was unable to stand on her toes/heels/one leg. (Tr. 86). Dr. Vale further indicated that claimant could occasionally climb ramp/stairs, kneel, crouch and stoop, frequently balance and never climb ladder/rope/scaffolds. (Tr. 86). Dr. Vale found claimant not to have any manipulative, visual, or communicative limitations to be established. (Tr. 87-88). Dr. Vale noted environmental limitations to include vibration, extreme cold and hazards such as machinery and heights. (Tr. 88). In the symptoms section, Dr. Vale opined that claimant's symptoms are "consistent with MDI conditions however are more significant than can be supported by objective findings." (Tr. 89). Dr. Vale noted that Dr. Alias reported claimant

putting forth a fair effort during the examination, and Dr. Charles Wetherington reported claimant not following the recommended course of treatment. Dr. Vale concluded that claimant's alleged symptoms are only partially credible, and the severity or duration of claimant's symptoms to be disproportionate to the expected severity or expected duration on the basis of claimant's medically determinable impairments. (Tr. 89). Dr. Vale noted that a consulting examination statement by Dr. Alias establishes that claimant has the ability to stand, sit and walk and claimant's ability to lift/carry and handling would be limited to thirty pounds. (Tr. 90). Dr. Vale declined to give controlling weight to the treating physician's significant functional findings inasmuch as Dr. Armela Agasino failed to provide objective findings in support of her findings. Dr. Vale determined to give controlling weight based on the comprehensive examination findings and opinions of Dr. Alias, a physical medicine and rehabilitation specialist. (Tr. 90).

In the Psychiatric Review Technique completed on March 19, 2003, by Dr. Stanley Hutson, Ph.D., opined that claimant does not have any medically determinable impairment. (Tr. 70-83). Dr. Hutson noted that claimant alleges physical disability due to her back and neck. (Tr. 82). Dr. Hutson noted that the medical records from Barnes Jewish Hospital indicate treatment for psychiatric or depression disease but claimant has not received any treatment or taken any prescription medications. Dr. Hutson indicated he could not find an actual diagnosis in the medical records file and thus determined there was not a medically determinable impairment. (Tr. 82).

In the treatment notes dated June 2, 2003, and January 9, 2004, claimant reported severe back pain to Dr. Agasino. (Tr. 196, 198). In the Medical Source Statement-Physical, Dr. Agasino opined that claimant is limited to frequently and occasionally lifting/carrying less than five

pounds, standing/walking a total of less than one hour, continuously standing/walking for seven

minutes, and sitting for fifteen minutes before having to move.  (Tr. 201).  Dr. Agasino further

opined that claimant can never climb, balance, stoop, kneel, crouch, or bend and is limited in

reaching, handling, fingering, feeling, seeing, hearing, and speaking.  (Tr. 202).  In support of his

findings of impairment-related capacities, Dr. Agasino cited claimant's degenerative disc disease,

disc protrusion, and lower back pain.  (Tr. 203).

## IV.    The ALJ's Decision

The ALJ found that claimant has not engaged in substantial gainful activity since

October 8, 2002, the alleged onset date of disability.  (Tr. 16).  The ALJ found that the medical

evidence establishes that claimant has degenerative disc disease with disc protrusion without

herniation or stenosis, osteoarthritis of the right shoulder and a history of carpal tunnel syndrome,

but that she does not have an impairment or combination of impairments listed in, or medically

equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ found that although

claimant has symptoms limiting her ability to work, claimant's allegations of symptoms totally

precluding all substantial gainful activity are not consistent with the evidence as a whole,

persuasive or credible for the reasons set forth in his decision.  The ALJ found that claimant has

the residual functional capacity for light work with lifting limited to ten pounds frequently and

sitting and standing for no more than thirty minutes at a time because of the need to alternate

positions.  The ALJ noted that claimant is a younger individual with more than a high school

education.  (Tr. 16).  The ALJ found that claimant can perform her past work as a cashier and a

clerk, but claimant has no transferable skills.  The ALJ further found that claimant has the residual

functional capacity to perform a full range of light work as compromised by her lifting limitation

to ten pounds and her need to alternate between sitting and standing.  (Tr. 16).

Based on claimant's capacity for the full range of light work in combination with her age, education, and work experience, the ALJ opined that claimant is not disabled.  (Tr. 16).  Considering claimant's vocational factors and her residual functional capacity with lifting limited to ten pounds frequently, and sitting/standing for no more than thirty minutes at a time because of a need to alternate positions, the ALJ opined that the vocational expert credibly testified that claimant could work as a receptionist/information clerk, cashier, and clerk and that such jobs exist in significant numbers in more than one region of the economy.  (Tr. 16-17).  The ALJ thus concluded that claimant was not under a disability at any time through the date of his decision.  (Tr. 17).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but

enough that a reasonable mind might accept it as adequate to support a decision." Id.  The

court's review "is more than an examination of the record for the existence of substantial evidence

in support of the Commissioner's decision, we also take into account whatever in the record fairly

detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court

will affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

      In reviewing the Commissioner's decision, the Court must review the entire

administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
      exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
      claimant's impairments.

6.      The testimony of vocational experts when required which
      is based upon a proper hypothetical question which sets forth the claimant's
      impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

      Claimant argues that the ALJ's decision is not supported by substantial evidence

on the record as a whole because the ALJ improperly discredited and failed to give controlling

weight to her treating physician's opinions.

A.          <u>Weight Given to Dr. Agasino's Opinions</u>

Claimant contends that the ALJ erred by not giving appropriate weight to Dr. Agasino's opinion that claimant has extremely severe functional limitations. <u>See</u> 20 C.F.R. § 404.1527(d)(2) (2005) (requiring the Commissioner to give controlling weight to the opinion of a treating physician if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence").

In the instant cause, Dr. Agasino treated claimant's back pain for several years. A review of her treatment notes reveal that Dr. Agasino never found claimant to have any severe functional limitations until completing the Medical Source Statement. Dr. Agasino's opinions were based primarily on claimant's subjective complaints and were not supported by clinical and diagnostic techniques or objective medical evidence. Such findings were inconsistent with other evidence in the record. <u>Cf.</u> <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001)(treating physician's vague and conclusory opinion is not entitled to deference); <u>see</u> <u>Prosch v Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000) (ALJ's decision to discount or even disregard the opinion of a treating physician will be upheld "where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermined the credibility of such opinions")(citations and internal quotation marks omitted). Indeed, the records from claimant's treating physician, Dr. Agasino, do not contain clinical evidence of a disabling back condition during the relevant time period or any restrictions imposed by Dr. Agasino based on claimant's severe functional limitations. As noted by the ALJ, the objective medical evidence, the MRI studies, revealed only small degenerative changes with a mild protrusion and wedging but no evidence of canal stenosis or disc herniation. Likewise, Dr.

Agasino's conservative treatment of claimant undermines the credibility of the opinions set forth in the Medical Source Statement. A review of the record shows no substantive evidence to support Dr. Agasino's opinions. Thus, the ALJ's determination not to rely on Dr. Agasino's opinions as to claimant's functional limitations was not improper. The substantial evidence on the whole record supports the ALJ's conclusion that Dr. Agasino's opinions were not entitled to controlling weight.

Opinions from consulting physicians may constitute substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); see Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)(opinion of consulting physician who examines claimant once generally does not constitute substantial evidence). This is especially so when the consulting physicians' opinions are compatible with other medical evidence in the record. Ward v. Heckler, 786 F.2d 844, 847 (8th Cir. 1986). The ALJ found that Dr. Alias, a specialist in physical medicine and rehabilitation, based her findings on her physical examination of claimant, and the review of the objective MRI study of the lumbar spine. Greater weight is generally given to the opinion of a specialist about medical issues in the area of speciality, than to the opinion of a non-specialist. See 20 C.F.R. §§ 404.1527(d)(5); 416.927(d)(5). After examining claimant, Dr. Alias opined that claimant could perform work-related functions such as standing, walking, and sitting and noted that claimant would benefit from weight reduction and physical therapy. Moreover, the ALJ noted that Dr. Agasino's findings were inconsistent with those of Dr. Vale who also gave controlling weight to Dr. Alias based on her comprehensive examination findings and the objective medical evidence..

In addition, the undersigned notes that the ALJ did not rely solely on the opinions

of the consulting physician in making his determination. Rather, a review of the decision shows

the ALJ to have examined the medical evidence contained in the record as a whole and to have

made his determination thereon. See Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

Consistent medical evidence, including such derived from treating and consulting physicians alike,

shows claimant experienced back pain but no problems with activities of daily living. Dr.

Agasino's treatment consisted of conservative treatment during the relevant period and never

imposed any functional limitations on work activities for claimant or found claimant's functional

limitations precluded gainful employment. Further, the ALJ noted that no doctor had ever

recommended back surgery, and how claimant waited two years before scheduling a follow-up

appointment with Dr. Wetherington, a neurosurgeon. See Walker v. Shalala, 993 F.2d 630, 631-

32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling

condition). Likewise, the ALJ noted how claimant failed to follow the recommended course of

treatment by Dr. Wetherington. The objective medical evidence shows claimant not to be

significantly debilitated by her back pain. Finally, the undersigned notes that where there are

conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the

Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000); Beasley v. Califano, 608

F.2d 1162, 1166 (8th Cir. 1979). This is so even when the medical evidence is in conflict.

Cantrell, 231 F.3d at 1107; Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)("Where the

medical evidence is equally balanced, ... the ALJ resolves the conflict."). "It is the ALJ's function

to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275

F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted).

   In the instant case, the ALJ determined to give Dr. Agasino's opinions neither

controlling weight nor much deference.  The ALJ gave good reasons for such determinations, and

such reasons are supported by substantial evidence on the record as a whole.  Dr. Agasino's

opinions were based primarily on claimant's subjective complaints and were not supported by

clinical and diagnostic techniques or objective medical evidence.  Where a physician's conclusion

appears to rest on a claimant's subjective complaints, the ALJ is permitted to discredit such

conclusion.  Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (citing Woolf v. Shalala, 3

F.3d 1210, 1214 (8th Cir. 1993)).  As such, a physician's conclusion may be accorded little

weight where it is based heavily on a claimant's subjective complaints and is at odds with the

weight of objective evidence.  See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999).

Moreover, the opinions contained in the Medical Source Statement, finding claimant has

extremely severe functional limitations are inconsistent with and not supported by claimant's

treating physician's treatment notes.  The opinions set forth in the Medical Source Statement are

conclusory, not based upon any clinical or laboratory diagnostic techniques, and are not supported

by the evidence contained in the record as a whole.  See Metz v. Shalala, 49 F.3d 374, 377 (8th

Cir. 1995)  (physician's conclusory statement without supporting evidence not amount to

substantial evidence of disability); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per

curiam) (physician's opinion must be supported by medically acceptable clinical or diagnostic

data).  Indeed, the MRI studies revealed only small degenerative changes.  Thus, the ALJ did not

err in according Dr. Agasino's opinion little weight.  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir.

2001).

       The substantial evidence on the record as a whole supports the ALJ's decision.

Where substantial evidence supports the Commissioner's decision, the decision may not be

reversed merely because substantial evidence may support a different outcome. Woolf, 3 F.3d at 1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

Finally, the undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). This is even so when the medical evidence is in conflict. Id. In the instant cause, the ALJ gave good reasons to discount the functional limitations rendered by Dr. Agasino inasmuch as her opinions were not supported by substantial medical evidence on the record as a whole. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf, 3 F.3d at 1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, the decision of the ALJ denying claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that claimant's complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written

objections to this Report and Recommendation.  Failure to timely file objections may result in waiver of the right to appeal the questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this __4th__ day of August, 2005.

_____/s/ Terry I. Adelman_____

UNITED STATES MAGISTRATE JUDGE
